# J. M. BELL ET AL., v. FARMERS D. N. BANK.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY, IN EQUITY.

Argued November 7, 1889—Decided January 6, 1890.
[To be reported.]

1. In a proceeding in equity to compel a transfer of stock in pursuance of a pledge thereof by an executor, one of defendants, for a loan, the executor who made the pledge is not a competent witness, after the death of the pledgee, to testify that the latter made the loan with knowledge that the money was to be used for purposes other than the business of the estate: Duffield v. Hue, 129 Pa. 94.

2. To a bill averring a loan to an executor, one of defendants, for the purposes of his testator's estate, upon a pledge of estate assets, an answer by the defendant executor alleging the true character of the transaction to be that the respondent borrowed and used the money for private purposes with the knowledge of the pledgee, is responsive, and must stand until overthrown by the plaintiff's proofs.

3. One who loans money to an executor upon a pledge of assets of the estate, with knowledge that the money is to be used for the private business of the executor, and not for the purposes of the estate, and that the

pledge is thus a misapplication of trust funds, cannot hold the assets, so pledged, as against the legatees under the will of the pledgor's testator.

Before Paxson, C. J., Sterrett, Clark, Williams, Mc-Collum and Mitchell, JJ.

No. 247 October Term 1889, Sup. Ct.; court below, No. 26 March Term 1884, C. P. No. 1, in Equity.

On January 4, 1881, Thompson Bell filed a bill in equity against the Farmers Deposit National Bank, and James Marshall, Jr., Thomas M. Marshall, Mark W. Watson and Matilda Marshall, executors of the last will and testament of James Marshall, deceased, averring in substance : (1) That one James Marshall, by his will dated May 23, 1867, admitted to probate on September 27, 1869, appointed James Marshall, Jr., Thomas M. Marshall, Mark W. Watson and Matilda Marshall, executors ; (2) that, by a paper dated April 1, 1874, the other executors authorized James Marshall, Jr., to assign, transfer and hypothecate stocks belonging to the estate, and to do and perform all necessary business of the estate ; (3) that on January 10, 1883, the said James Marshall, Jr., borrowed from Thompson Bell, the plaintiff, for the purposes of the estate, the sum of $20,000 and delivered as a pledge for payment of said debt, a certificate for 80 shares of the capital stock of the Farmers Deposit National Bank, bearing date December 18, 1882, and issued to James Marshall's estate, together with a note and power of attorney to sell said stock in case of default of payment of said note ; (4) that said note was not paid at maturity, and, after notice, the said Bell sold said stock at public sale and became purchaser thereof ; (5) that demand was made on the Farmers' Deposit National Bank to permit a transfer of the stock but said bank refused to permit any transfer to be made, giving as a reason that Thomas M. Marshall, M. W. Watson and Matilda Marshall, as executors of James Marshall, deceased, claimed the stock.

Upon said averments the prayers for relief were, that the plaintiff be decreed to be the lawful owner of said stock ; that the defendant bank be ordered to transfer the stock to the plaintiff upon its books and issue him a certificate therefor in his own name ; and for general relief.

The bank answered, admitting the issue of a stock certificate to James Marshall's estate; a demand by the plaintiff for a transfer of said stock, and the refusal of the bank to permit such transfer, because of a notice received from .some of the beneficiaries under the will of James Marshall, deceased, and from the trustees under said will. The answer of the executors of James Marshall, deceased, other than James Marshall, Jr., averred, upon information and belief, that the transaction referred to in the bill was in substance a borrowing by James Marshall, Jr., doing business as James Marshall & Co., for the purposes of the business of James Marshall & Co.; that the money borrowed was paid by the plaintiff to the firm of James Marshall & Co., with knowledge that the loan was made for the use and benefit of that firm, in which neither of the respondents, nor the estate, was a partner; that the pledge of said stock by James Marshall Jr., to the plaintiff for said loan was without authority and void.

James Marshall, Jr., filed a separate answer, the third paragraph whereof was as follows:

" 3. I deny the allegations of the third paragraph of the bill, and state that the facts of the transaction therein referred to, are as follows: I did borrow for the firm of James Marshall & Co. on the 10th day of January, 1883, from plaintiff, the sum of twenty thousand dollars ($20,000), and I then gave to the said plaintiff an acknowledgment of the indebtedness, a copy of which, marked Exhibit B, is annexed to the bill in this case; and I did then leave with the said plaintiff a certificate for eighty (80) shares of stock of the Farmers Deposit National Bank of Pittsburgh, made by the said bank in the name of 'James Marshall's Estate.' I cannot from memory give the exact form and wording of the said certificate, but the same is now in possession of the plaintiff. The said stock belonged to the said James Marshall at the time of his death, which death occurred on the 9th day of September, 1869. The plaintiff knew that the money was borrowed for the firm of James Marshall & Co., and the fact of how the note was to be drawn was a matter discussed with the plaintiff prior to the preparation of the same; it was signed by James Marshall, acting executor, because the stock in the bank stood in the name of the said decedent, James Marshall, and the note was a stock note; that is, a form prepared for the purpose of pledging stock."

After the filing of the answers, the plaintiff died, and Emma M. Bell and James M. Bell, his executors, were submitted as plaintiffs. Subsequently, issue having been joined, the cause was referred to *Mr. Henry R. Ewing*, appointed examiner and master.

At the hearing before the master, James Marshall, Jr., one of the defendants, was offered as a witness in their behalf, the defendants showing that he had been dismissed by the Orphans' Court from the position of executor and trustee under the will of James Marshall, deceased, and that the other executors and trustees, and all the legatees and devisees under said will, had released him from liability to the estate in respect of the matters involved in this case; whereupon the plaintiffs objected to his competency to testify. Upon the question thus raised, the master made the following ruling:

The competency of James Marshall, Jr., depends on whether his interest is adverse to the right of Thompson Bell. The stock in controversy in this case was part of the residuary estate of his father, James Marshall, deceased, and by the will of his father, James Marshall, Jr., was entitled to one fourth of said residuary estate. Therefore, he is undoubtedly interested in the estate of his father, James Marshall, and if that estate wins in this case, the amount to be distributed to his devisees, of whom James Marshall, Jr., is one, will be increased. But that is not the test. It is his relation to the estate of Thompson Bell that settles his competency or incompetency to testify in this case.

In order to exclude his testimony, it is necessary to show that his interest is adverse; that is, against the right of Thompson Bell. In other words, to exclude his testimony his interest must be to see Thompson Bell lose his case. Now if Thompson Bell loses, although the estate of James Marshall is increased thereby, yet James Marshall, Jr., becomes personally liable to Thompson Bell's estate for the whole of the $20,000 note given in evidence and which is the cause of the controversy in this case. He gave the note and received the money on it and unless Thompson Bell's estate can hold James Marshall's estate for the amount of it, his estate can hold James Marshall, Jr., personally. True, if Thompson Bell wins, James Marshall, Jr., becomes personally liable to his father's estate for

a misappropriation of its assets, but he is in the other event liable for the whole of the amount in controversy; and hence his interest cannot be to see Thompson Bell lose; that is, his interest is not adverse to that of Thompson Bell.

Whatever effect the releases given James Marshall, Jr., by the other executors and trustees of James Marshall have— if they have any, is doubtful—would be to make the interest of James Marshall, Jr., in favor of the right of Thompson Bell. But the master is of opinion that the interest of James Marshall, Jr., is not adverse to the right of Thompson Bell and his evidence is admitted.

—From the pleadings and evidence the master found the following facts:

Prior and up to September 9, 1869, James Marshall, Sr., and James Marshall, Jr., carried on the foundry business in the city of Pittsburgh, under the firm name of James Marshall & Co., under a verbal agreement that James Marshall, Jr., was to receive one fourth the profits, but have no interest in the property. There was no certain time fixed when the partnership should end, and no agreement or arrangement for continuing the business after the death of either party. On the day above named James Marshall, Sr., died, leaving a will which was duly probated, whereby he gave to his wife, Matilda, his dwelling house for life and $4,000 per annum during her life, and all the balance of his estate he bequeathed as follows:

"4. I bequeath to my executors all the balance of my estate, real, personal and mixed, to have and to hold the same in trust for the use and benefit of my children, viz: Harriet Watson, James, Julia and Anna Frances, making them all equal at twenty-one years of age, share and share alike; and should any of them die without lawful issue, their interest shall be equally distributed to the survivors or the heirs of my deceased children, by investing it for their benefit, or paying to them the proceeds, as I wish them, the executors, to be invested with full power to give or withhold as they think best for the interest of any or all of my children; and for the purpose of carrying out this, my purpose, I hereby authorize my executors to purchase and sell real estate at public or private sale, as they deem for the best interest of my children, and to hold it in trust for them, or give it to them as they regard their best interest."

Of his will he appointed as executors and trustees, his son, James Marshall, Jr., his wife, Matilda Marshall, his brother, Thomas M. Marshall, Esq., and his son-in-law, Mark W. Watson. All the executors qualified and filed an inventory in 1869, but never filed any account until after the failure of James Marshall, Jr., in 1883.

James Marshall, Jr., was the acting executor, attending to all the business of the estate, the others taking little or no part in it; and in 1874 they executed a power of attorney authorizing him, inter alia, to make and execute all necessary bills, drafts or acceptances which pertain to the business of the estate, and to assign, transfer and hypothecate gas, water, or any other stock belonging to the estate, as security for any loan necessary to the purposes of the estate, and to do and perform all other necessary business of the estate for and in the names of the other executors.

After the death of James Marshall, Sr., the business was carried on by James Marshall, Jr., in the same place and in the same name, from 1869 to 1883, the son keeping the books and accounts the same as before, crediting the estate regularly with three fourths of the profits, etc., using the realty and personalty without paying any rent or charging rent on the books, or paying for, or making any account of the personalty; and none of the other executors and trustees or any of the cestuis que trust under the will of James Marshall authorized or had any knowledge of these transactions while they were going on.

During the period from the death of James Marshall, Sr., in 1869, to the failure of James Marshall, Jr., in 1883, James Marshall, Jr., collected all income due his father's estate from all sources, except from the real estate used by the firm; kept a separate account of it in the Farmers Deposit N. Bank and from time to time paid over portions of it to his mother and sisters for their support.

While the transactions of the firm were carried on by him on the presumption that the estate of his father was interested in the firm to the extent of three fourths of the profits, there never were actually any of the profits of the firm paid to the estate, and none of the cestuis que trust under the will of James Marshall ever received any of the profits of the firm, made after his death.

Master's Report.

James Marshall, Jr., made an assignment of his property for the benefit of creditors on April 16, 1883, and on April 30, 1887, was discharged by the Orphans' Court of the county of Allegheny from his position as executor and trustee under the will of his father. At the time of the assignment there was a large amount of the income of the estate of his father not paid over by him to the cestuis que trust.

All the debts of James Marshall were paid before 1876. Among the assets of his estate were certain shares of stock of the Farmers Deposit N. Bank. A certificate for 80 of the shares was issued in the name of the estate of James Marshall under date December 18, 1882. On January 10, 1883, James Marshall, Jr., gave to Thompson Bell a note for $20,000 payable on demand, and at the same time pledged, as collateral security therefor, said certificate of stock, and received from Bell $20,000 in cash, or its equivalent. The proceeds of this note were used by the firm of James Marshall & Co., and at the time of lending the money and taking the security aforesaid, Bell knew that it was the intention of James Marshall, Jr., so to use the money. The note being unpaid on April 18, 1883, demand was made on the bank for a transfer of the stock to the name of Thompson Bell, which was refused, and on April 24, 1883, the note was duly protested for non-payment. The stock was then put up at public sale, after public advertisement, and sold to Thompson Bell, and demand again made on the bank for transfer, which was again refused, the reason given being that it had received from the executors of the will of James Marshall, deceased, notice not to permit such transfer. Thereupon Thompson Bell filed this bill.

Upon the facts so found by him, the master reported his opinion in part as follows:

The case of the First N. Bank's App., 19 W. N. 309, decided: 1. That at the death of James Marshall, Sr., the firm of James Marshall & Co., was dissolved. 2. That the estate of James Marshall, Sr., was not in the firm of James Marshall & Co., after his death. 3. That James Marshall, Jr., as executor, had no right to pledge the assets of his father's estate as security for loans made to the firm. 4. That any party taking these assets as security for loans to the firm, with knowledge

that the money loaned was to be used for the purposes of the firm, could not compel a transfer to themselves of such assets. 5. That the executors and trustees, under the will of James Marshall, Sr., could defend in behalf of the innocent cestuis que trust, in a suit brought by such pledgee to compel a transfer. The master considers it unnecessary to again discuss the reasons for the decision in that case and the law upon which it is decided. It was decided upon good reason, and after a full discussion of the authorities bearing on the law of the case.

In this case, then, Thompson Bell loaned $20,000 to James Marshall, Jr., and took as security therefor 80 shares of the stock of the Farmers Deposit N. Bank, part of the assets of the estate of James Marshall, deceased. The money loaned was used for the purposes of the firm of James Marshall & Co., and the master has found that at the time the loan was made and the security taken, Thompson Bell knew that the money was to be used for the purposes of that firm. It seems to the master, and he so decides, that the First N. Bank's App., supra, entirely covers this case and rules it, and if his findings of fact are correct, this bill should be dismissed.

As to why he finds the facts as he has found them, he suggests the following:

The only controversy in this case is as to the purpose of the loan from Bell to Marshall. Bell alleges that he loaned the money for the purposes of the estate of James Marshall, deceased, while the Marshall executors allege that the money was borrowed for the firm of James Marshall & Co. That all the money borrowed was actually used for the purposes of the firm, is undoubted. . . . . On the question of the knowledge of such use by Thompson Bell at the time the loan was made, the only testimony we have is that of James Marshall, Jr. . . . . . From this testimony the master has found as a fact that Thompson Bell, at the time he made the loan of $20,000, and took as security the stock in controversy, knew that the money loaned was to be used for the purposes of the firm of James Marshall & Co. But aside from and outside of the testimony of James Marshall, Jr., if he is not a competent witness in this case, there is ample evidence to show that Thompson Bell knew of the improper use of the proceeds of the $20,000 note. His books produced in evidence, show that the money was by

him loaned to James Marshall & Co. . . . . The testimony of Oliver Wylie is to the effect, that he is familiar with the notes discounted for James Marshall & Co. by Thompson Bell, from 1876 to 1883, and in every case, no matter how the notes were drawn up, if James Marshall & Co. received the money on them, they were indorsed in red ink, "James Marshall & Co." The note in suit is so indorsed, and this is persuasive as to the knowledge of Thompson Bell as to the use to be made of the money loaned on this note. . . . .

But, taking the case simply on the pleadings, if the answers or any one of them are. responsive to the bill, the case of complainant falls. The complainant has alleged that he loaned the money for the purposes of the estate of James Marshall, deceased, but he has introduced no evidence to show for what purpose he loaned the money. The evidence of complainant shows only that he loaned to James Marshall, Jr., the $20,000 but shows no use for which it was loaned. All the evidence in the case as to what use the money was actually put, or to what use it was intended to be put, at the time it was loaned, was introduced by the defendants. There is nothing, therefore, in complainants' case to offset the allegations of the defendants' answers if they or any of them are responsive to the bill.

The answer of M. W. Watson, Thomas M. Marshall and Matilda Marshall being made only on information and belief, is not responsive. The mere denial of James Marshall, Jr., would not make his answer responsive, but he goes further. He admits the loan and pledge, as set forth in the bill, but states that the purpose was different from that alleged by Bell, and that Bell knew that it was for a different purpose than what he alleged in his bill, as the matter was discussed between them at the time the loan was made, and that the note was drawn as. it was in order to hold the estate.

The master is of opinion that this answer is responsive to the bill. It sets up no new contract, but admits the contract was made as set forth by the complainant, and denies a matter entirely outside of the contract itself. The purpose of making a contract is entirely outside of the actual contract. It is not the contract itself, but an incident to the contract. That such an answer is responsive is ruled in Pusey v. Wright, 31 Pa.

387, and Eaton's App., 66 Pa. 483. That the answer of James Marshall, Jr., is evidence for his co-defendants, is clearly ruled in Mills v. Gore, 20 Pick. 34.

But while the defence in this case can be made for the innocent cestuis que trust under the will of James Marshall, deceased, it cannot be made for James Marshall, Jr. He signed the note and received the money on it, and has no equities, as far as his own share of the stock is concerned, against Thompson Bell's estate. The circumstances in this case, as far as his share is concerned, are not different from those in the case of the First N. Bank's App., supra, and the decree should be the same as to it.

For these reasons, the master recommends that the plaintiff's bill be dismissed at plaintiff's cost, except as to the share of James Marshall, Jr., in the stock in controversy, which should be held by the executors and trustees under the will of James Marshall, deceased, subject to any rights which the plaintiffs have to claim and take the share, or interest, which the Orphans' Court, on final distribution of the estate of James Marshall, deceased, may determine as coming to James Marshall, Jr., out of or from the shares of stock in controversy in this case.

Exceptions to the report of the master were filed with and overruled by him and afterwards renewed before the court. After argument, the report was confirmed in the following opinion by STOWE, P. J.:

"After a careful consideration of this cause I am unable to sustain any of the exceptions to the master's report. I fully concur in every respect with the views expressed by him. I also think the form of decree suggested is proper under the circumstances. The exceptions filed to said report by plaintiffs' counsel are therefore overruled and the report of the master is now confirmed. Decree to be prepared by counsel as recommended."

The court then signed a formal decree, dismissing the bill at the cost of the plaintiffs; declaring the stock pledged to Thompson Bell the property of the estate of James Marshall, deceased, and ordering that the certificate therefor be delivered to the trustees of said estate, to be held by them subject to any

right which the plaintiffs had to claim and take the share or interest, which the Orphans' Court, on final distribution of the estate of James Marshall, deceased, may determine as coming to James Marshall, Jr., out of or from the said shares of stock.

Thereupon the plaintiffs took this appeal, specifying that the court erred:

1, 2. In sustaining the master's rulings respecting the competency to testify and respecting the effect of the answer of James Marshall, Jr.

3. In dismissing the bill.

5. In not sustaining the bill, at least so far as the interest of James Marshall, Jr., was concerned.

6. In imposing the costs upon the plaintiffs.

*Mr. George Shiras, Jr.*, for the appellant:

1. Under § 5, act of May 23, 1887, P. L. 158, James Marshall, Jr., was plainly incompetent to testify. The master and court below seemed to think that if his interest was not adverse to that of Bell, the deceased party to the contract in action, he was competent. But Marshall was the surviving party to the contract, as well as a party upon the record, and the statute is express that such surviving party shall not be competent. It is plain, however, that his interest was adverse to that of the decedent. He was interested as a legatee in the estate of James Marshall, deceased. Whether, as the master suggests, he would become liable to Bell's estate, if the latter's claim should be defeated, would depend upon the nature of the testimony of the witness; and the objection to his competency had to be made and decided when he was called, and not in the light of what he might subsequently choose to testify.

2. Nor was the answer of James Marshall, Jr., available as evidence to establish the defence. The provisions of the act of 1887, disqualifying a surviving party as against the estate of a deceased party to a contract, are applicable as well in equity as at law. Such surviving party cannot be permitted to defeat the case of the deceased party by his own testimony, whether he be called as a witness, or his testimony be offered in the form of an answer. The public policy of the act is applicable in either event. Moreover, the answer of James Marshall, Jr., is not, as respects the vital question in the case, re-

sponsive to the bill; it is by way of confession and avoidance and itself needs to be sustained by evidence aliunde : 1 Daniell's Ch. Pr., 850. Besides, it is manifestly evasive and insufficient, in that it does not aver anything that can be met by evidence; it ought to have averred that Bell was informed what the money was borrowed for, or had notice thereof by reason of certain facts.

3. But even if the defendant's version of the case be accepted, why are not the plaintiffs entitled to a decree? Marshall always believed the estate was in the firm, and kept the books of both the estate and the firm on that hypothesis; and if he did tell Bell the money was for the use of the firm, he likewise told him the estate was interested. To whom would Bell go except to the executor for information? Was he obliged to call in a lawyer and examine the will and partnership articles to ascertain whether the executor's construction of them was right? Either a sale or pledge of the stock by the executor, for money paid to him in good faith, would give Bell a good title: Trolton v. Shippen, 2 Pa. 358; Keane v. Roberts, 4 Madd. Ch. 332; McLeod v. Drummond, 14 Ves. 353; s. c. 17 Ves. 152; Petrie v. Clark, 11 S. & R. 386; Carter v. Bank, 71 Me. 448 (36 Am. Rep. 338); Wood's App., 92 Pa. 379. This case differs in important particulars from First N. Bank's App., 19 W. N. 312; and there is no reason why this court should follow Smith v. Ayer, 11 Otto 325, and abandon the English and Pennsylvania doctrine, which regards executors as formally and substantially the owners of the assets.

4. At all events, why are not the plaintiffs entitled to a decree as to the share of James Marshall, Jr., in this stock? All the necessary parties were before the court; the executors, James himself, as well in his capacity of executor as legatee, and the complainants, representing a party from whom James had borrowed on the strength of his pledge of stock. All the debts of the decedent had been long discharged. James, as all admit, would have made a valid sale of this stock. He could have sold and assigned his interest in his father's estate. The stock pledged by him to Bell was but a small part of his share of that estate, and it was pledged before his insolvency. In any view of the facts and the law, we submit that the court below had power to make a final decree declaring that the plaintiffs had the legal and equitable ownership of this stock.

*Mr. D. T. Watson* (with him *Mr. J. H. White*), for the appellees:

1. This case is on all fours with First N. Bank's App., 19 W. N. 312.   The same question came up again in Odd Fellows S. Bank's App., 123 Pa. 357, with the same result.   These two cases settle the following propositions:  (1) The death of James Marshall dissolved the firm of James Marshall & Co.: Gratz v. Bayard, 11 S. & R. 46 ;  (2) a claim that the will of said decedent authorized a continuance of the partnership and made his general assets liable for its subsequent debts, must be supported "by the most clear and unambiguous language : " Burwell v. Mandeville, 2 How. 560 ; Smith v. Ayer, 11 Otto 320 ; Scholefield v. Eichelberger, 7 Pet. 586 ; (3) this will did not authorize such a continuance ; (4) James Marshall, Jr., therefore could not continue the firm so as to bind the estate, or use the assets of the decedent for such purpose : Reppert v. Colvin, 48 Pa. 252; Levy v. Cadet, 17 S. & R. 129 ; (5) in dealing with James Marshall, Jr., as executor, Bell was visited with knowledge of the contents of the will and with notice of his lack of authority : Garrard v. Railroad Co., 29 Pa. 158 ; Wood's App., 92 Pa. 392 ; Hill v. Epley, 31 Pa. 336 ; Tripp v. Caldwell, 31 Pa. 233 ; Smith v. Ayer, 11 Otto 326 ; Petrie v. Clark, 11 S. & R. 384; 2 Williams on Executors, \*1630, \*1625, \*1626.

2. In Smith v. Ayer, 11 Otto 320, the Supreme Court of the United States decided the very points here under discussion, fully and completely covering the case at bar.   Our position is fully sustained also by Miller v. Williamson, 5 Md. 219 ; Prall v. Hammill, 28 N. J. Eq. 66, cited and approved in Wood's App., 92 Pa. 392 ; Shaw v. Spencer, 100 Mass. 382 ; Thompson v. Brown, 43 Ind. 203 ; Field v. Schieffelin, 7 Johns. Ch. 150 ; McNeillie v. Acton, 4 DeG. M. & G. 744; Devitt v. Carey, 2 L. R. 255.   Very plain error must be shown to overthrow the master's finding of actual knowledge on Bell's part that the loan was for James Marshall & Co.: Harland's Accounts, 5 R. 323; Ludlam's Est., 13 Pa. 188.   That Bell did so know is apparent under the pleadings and proof.   The answer of James Marshall, Jr., was clearly responsive : Pusey v. Wright, 31 Pa. 395 ; Everly v. Groff, 21 Pa. 256 ; Horton's App., 13 Pa. 71; and was evidence for his co-defendants : Field v. Holland, 6 Cranch. 8 ; Mills v. Gore, 20 Pick. 34.

3. Even if the rule respecting the effect to be given to a responsive answer required that the respondent be competent as a witness, such requirement was complied with. The proper test would be that of competency at the time the answer was filed: Galbraith v. Zimmerman, 100 Pa. 376. James Marshall, Jr., was then unquestionably competent. We submit, however, that he was so subsequently, also, and that his testimony taken before the master was admissible. At the time he testified, he had been dismissed from his position as executor and trustee and was no longer an indispensable party, and, in consequence of the releases given him, his interest was wholly adverse to the estate. Before these releases were given, his interest was in equilibrio, he being liable for illegally using or attempting to use the stock, whichever way the case should go, and he was therefore competent: Gulding v. Gulding, 97 Pa. 414. His testimony fully disposes of the plaintiff's case. The surrounding circumstances also tend to show Bell's knowledge as to the character of the loan. The position that the plaintiffs are entitled to a decree as to James Marshall, Jr.'s, share of the stock, was advanced and denied in First N. Bank's App., 19 W. N. 312. The decree here appealed from did the utmost for the plaintiffs that the court could do.

OPINION, MR. CHIEF JUSTICE PAXSON:

This case has been so well considered by the learned master and the court below that an elaborate discussion of it here is unnecessary. The master finds the pivotal fact in the case as follows: "From this testimony the master has found as a fact that Thompson Bell, at the time he made the loan of $20,000, and took as security the stock in controversy, knew that the money loaned was to be used for the purposes of James Marshall & Co." It needs neither argument nor authority to show, that if Mr. Bell knew when he loaned this money that it was for the use of the firm of which James Marshall, Jr., was a member, he had no right to receive and hold the assets of an estate of which the said James Marshall, Jr., was an executor as collateral security for such loan. He knew that it was a misapplication of trust funds; that it was a pledge of securities belonging to the estate for the personal debt or liability of the executor's firm.

Without denying the legal conclusion from this fact, however, the appellee contends that it was found upon incompetent evidence, and his first specification of error is directed to this point. We are of opinion that under the authority of Duffield v. Hue, decided at the last term, in the western district, and not yet reported [129 Pa. 94], James Marshall, Jr., was an incompetent witness, under the act of 1887. If this were all, we would be compelled to reverse this case. It is not all, however. In his answer to the bill, James Marshall, Jr., distinctly avers that the money was borrowed for the use of the firm of James Marshall & Co., and that the plaintiff knew such to be the fact. The other executors make substantially the same averment in their answer. If, then, this averment is responsive to the bill, the answer must stand, for the reason that it was not overthrown by plaintiff's proofs. In such case, it matters not that Marshall was an incompetent witness, and his testimony improperly received. The effect of his answer remains the same, and, until it is overcome by the quantity of proof essential in such cases by equity practice, the fact must be assumed to be as set forth in the answer. This brings us at once to the question, was the answer responsive?

Upon this point we are not in any doubt. The answer sets up no new contract. On the contrary, it admits the contract as set forth in plaintiff's bill, and denies a matter outside of the contract itself. This subject was thoroughly discussed by our late brother SHARSWOOD, in Eaton's App., 66 Pa. 483, and the authorities collected with his usual care. He there adopts the rule laid down by Chief Justice PARKER, in Bellows v. Stone, 48 N. H. 475, as follows: "If the whole subject matter of the statement or allegation in the answer might have been left out, then the allegation in the answer upon that subject is in no sense responsive to the bill; the bill requiring no statement upon that point. But, if the omission of some statement upon that subject would furnish just ground of exception to the answer, then the statement to the extent to which it is required, and whatever its character, whether affirmative or negative, is but a response to the requisition of the plaintiff." In Allen v. Mower, 17 Vt. 61, it was said: "It is readily perceived that everything in the answer responsive to the bill, as to the creation of the original liability charged, must be taken together,

as part and parcel of one entire transaction." In Pusey v. Wright, 31 Pa. 387, it was said by THOMPSON, J.: "If a con-contract be set forth, and the defendant be called on to answer it, a denial that it exists, modo et forma, would not be good, according to chancery practice, for this is subject to the implication that it existed in some other form. To avoid this, the defendant should state how it existed, and wherein it had no existence." This meets the case in hand precisely. The defendants did not deny the contract. They admit having borrowed plaintiff's money to the amount averred in the bill, but they say it was not borrowed for the use of the Marshall estate, but for the firm of James Marshall & Co., and that the plaintiff knew it. We are of opinion the answer was responsive.

The decree is affirmed, and the appeal dismissed, at the costs of the appellants.